**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROMEO ORAHA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 14 C 10440** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **Magistrate Judge Finnegan** |
| **Acting Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Romeo Oraha seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "SSA"). 42 U.S.C. § 416(i), 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the case should be remanded. Defendant responded with a competing motion for summary judgment in support of affirming the decision. After careful review of the record, the Court denies Plaintiff's request for remand, grants the Commissioner's motion, and affirms the decision to deny benefits.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on March 24, 2010, alleging that he became disabled on May 1, 2006 due to a back and knee injury, diabetes, high cholesterol, depression, and arthritis. (R. 139, 368). The Social Security Administration denied the applications initially on June 8, 2010, and again upon reconsideration on February 15, 2011. (R.

134-35, 157-61, 167-69).  Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Robert Karmgard (the "ALJ") four times between March 2012 and May 16, 2013 while trying to find legal representation and complete the medical record.  At a fifth and final hearing on July 19, 2013, Plaintiff chose to proceed without counsel and provided testimony along with medical expert Alan E. Kravitz, M.D. (the "ME"), psychological expert Michael E. Carney, Ph.D. (the "PE"), and vocational expert Stephanie R. Archer (the "VE").  (R. 8-75).  The following month, on August 26, 2013, the ALJ found that Plaintiff is not disabled because none of his impairments, alone or in combination, significantly limited his ability to do basic work activities prior to his March 31, 2007 date last insured ("DLI").  (R. 140).  The Appeals Council denied Plaintiff's request for review on November 7, 2014, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.  (R. 1-5).

In support of his request for reversal or remand, Plaintiff argues that the ALJ: (1) failed to adequately develop the record as required for a pro se claimant; (2) erred in determining his disability onset date; (3) improperly concluded that he had the residual functional capacity ("RFC") to perform light work prior to March 31, 2007; and (4) erred in assessing his statements regarding the limiting effects of his symptoms.  As discussed below, the Court finds that the ALJ's decision is supported by substantial evidence and does not require reversal or remand.

## **FACTUAL BACKGROUND**

Plaintiff was born on July 1, 1958, making him 48 years old on the date last insured and 55 years old at the time of the ALJ's decision.  (R. 19, 364).  He completed high school in Iraq and is able to read and write in English and perform basic arithmetic.

(R. 19-20). Plaintiff's work history includes six months as a machine operator in 1995, and seven years performing home healthcare for his mother off and on between 1997 and 2005. (R. 28-31, 370). He was also self-employed doing part-time construction work from January 2002 through at least May 2005, and spent those last few months lifting 100 or more pounds and standing on his feet most of the day. Plaintiff claims that his back pain ultimately became disabling on May 1, 2006. (R. 21, 27-28, 370).

## A.    Medical History

### 1.    1996 through 2001

The first available medical records are from Amjad Zureikat, M.D., an internist who treated Plaintiff three times in July 1996 for right knee trauma with swelling and decreased range of motion. (R. 581-82). A July 9, 1996 MRI showed large joint effusion, minimal sprain, probable small synovial cyst, and subcutaneous edema. (R. 596-97). Plaintiff returned to Dr. Zureikat in July and October 1997 complaining of left shoulder pain, and received a prescription for Naprosyn. (R. 576, 585). Nearly four years later, on July 31, 2001, Plaintiff told Dr. Zureikat that he was experiencing lower back pain and could not bend. The doctor administered two trigger point injections and prescribed Motrin for the pain. (R. 587). The following month, on August 23, 2001, Plaintiff's back pain was still radiating to his buttocks so Dr. Zureikat administered physical therapy, including heating pads, ultrasound, electrical stimulation and massage. (R. 586, 595).

### 2.    2002 through 2007

There are no further medical records until 2007, but according to a three-sentence letter from Dr. Zureikat dated May 9, 2012, Plaintiff was his patient again "from

2005 to 2006." (R. 533). Dr. Zureikat stated that Plaintiff "was being seen for a back injury and treated by our office with different therapies including physical therapy and injections for inflammation and pain. He had to move out of Chicago and discontinued care under our office." (*Id.*). Chiropractor Igor Russo, D.C., submitted a similarly terse letter dated November 26, 2013 stating:

> This is to certify that [Romeo Oraha] has been under my care for quite some time due to severe lumbar disc syndrome, low back pain and lower extremity radiculitis. Patient was first seen for this condition on 09/02/2006. Furthermore, the patient continued to return for therapy throughout 2007 and proceeding (sic) years as well for this same condition.

(R. 628).

The record contains one treatment note from 2007 that may be from Dr. Russo, as it is similar in appearance and format to an October 2010 note he submitted to the Social Security Administration. (R. 497-98, 565-67, 624-26). That September 7, 2007 record stated that Plaintiff had "presented himself for an initial examination" due to "aching, spastic and throbbing pain in the low back" that "radiates into both legs," and "aching and numbing pain in both legs." (R. 565). Plaintiff reported that he could stand, walk, bend and twist, but "not without some difficulty because of the resulting pain." (*Id.*). He also indicated that he was "symptom free" until recently and "had not experienced prior symptoms similar to his current complaints." (*Id.*).

On examination, Plaintiff was able to walk without an antalgic gait but he exhibited moderate restriction in active range of motion of the lumbar spine, and straight leg raise and Kemp's tests to detect pain in the lumbar spine were positive bilaterally. (R. 565-66). The treater assessed lumbago (low back pain), lumbar radiculitis and myalgia/myositis (muscle pain/inflammation), and opined that Plaintiff would be "unable

to perform strenuous work, indefinitely." (R. 565-66). He administered 30 minutes of therapeutic activities, 15 minutes of neuro-muscular re-education and manual therapies, and an ultrasound with electrical muscle stimulation (EMS), and recommended that these treatments be repeated three times a week for five weeks. (R. 567).

### 3. 2008 through 2013[1]

There are no medical records reflecting that Plaintiff received further treatment again until October 10, 2009, when he started seeing Dima Hanna, M.D., a family medicine doctor at the Skokie Family Clinic. The focus of that visit was Plaintiff's diabetes; the treatment note said nothing about back pain. (R. 465). Five months later, on March 24, 2010, Plaintiff applied for disability benefits. On June 1, 2010, he made his first complaint to Dr. Hanna of back pain with radiation to his right leg. (R. 550). He also stated that a cousin had died and he was feeling "very stressed." (*Id.*). A few months later, on October 26, 2010, Plaintiff saw Dr. Russo for help with his low back pain. Dr. Russo administered 17 sessions of manual therapies, neuro-muscular re-education, ultrasound, EMS and spinal manipulation from April through June 2011. (R. 498, 507-23). In the meantime, Plaintiff returned to Dr. Hanna on October 28, 2010 complaining of continued back pain and feelings of depression. (R. 551).

At some point prior to June 30, 2012, Plaintiff began treating with Abdulmassih Abdulmassih, M.D., another family practitioner. The record does not contain any treatment notes from Dr. Abdulmassih, but it appears he sent Plaintiff for an MRI of the lumbosacral spine on June 30, 2012. The test showed spondylosis changes; multilevel disc protrusion; moderate spinal stenosis, most marked at L3-L4 and L4-L5; and lateral

---

[1] Since these records are dated well after Plaintiff's March 31, 2007 date last insured, the Court discusses them here only to the extent they may bear on Plaintiff's arguments for remand.

recesses and neural foraminal stenosis. (R. 562-63). Dr. Abdulmassih referred Plaintiff to a neurosurgeon, Sheldon Lazar, M.D., who examined Plaintiff in August and September 2012. (R. 557-58, 561). In a letter to Dr. Abdulmassih dated September 21, 2012, Dr. Lazar indicated that Plaintiff had opted for surgical intervention and would be undergoing a bilateral microdiscectomy at L5-S1. (R. 557). The record does not contain any surgical notes from Dr. Lazar, but Plaintiff testified at the July 19, 2013 hearing before the ALJ that the surgery took place in November 2012. (R. 23).

On May 15, 2013, Dr. Abdulmassih submitted a Lumbar Spine Residual Functional Capacity Questionnaire ("RFC Questionnaire") to assist with Plaintiff's application for disability benefits. (R. 618-21). Dr. Abdulmassih stated that Plaintiff suffers from back pain with "sciatical radiculopathy" and is "very limited" after back surgery. (R. 618). His symptoms include severe lower back pain and stiffness, and his medications cause him to be very fatigued, drowsy and dizzy. (R. 618-19). Dr. Abdulmassih indicated that Plaintiff shows signs of reduced range of motion in twisting, bending and stooping, and opined that pain would frequently interfere with his attention and concentration. (R. 619).

As for specific functional abilities, Dr. Abdulmassih noted that Plaintiff can only walk a half block before resting or experiencing severe pain, can sit and stand for only five minutes at one time, and can sit, stand and walk for less than 2 hours in an 8-hour workday. (R. 619-20). According to Dr. Abdulmassih, Plaintiff would need a job that permits shifting positions among sitting, standing, and walking, and would need to take unscheduled 10-15 minute breaks every hour. (R. 620). If Plaintiff is seated for a prolonged period his legs should be elevated 90 degrees, but he does not require the

use of a cane or other assistive device to stand or walk. (*Id.*). Plaintiff can rarely lift less than 10 pounds; never lift and carry more than 10 pounds; grasp, turn, and twist objects with both hands 90 percent of the workday; and reach his arms, including overhead, 30 percent of the workday. (R. 621). Though there is no evidence that Dr. Abdulmassih treated Plaintiff prior to 2012, he claimed that the earliest date the "description of symptoms and limitation in this questionnaire applies" is early 2002. (*Id.*).

On June 13, 2013, Plaintiff had an MRI of the lumbar spine that confirmed postoperative changes at L5-S1 with "a persistent or recurrent protrusion" causing "mild central canal stenosis." (R. 611). Dr. Abdulmassih referred Plaintiff to another neurosurgeon, Wesley Y. Yapor, M.D., who recommended in July 2013 that Plaintiff have an L3 to S1 decompression and stabilization procedure. (R. 614-15). The record does not reflect whether Plaintiff had that surgery.

**B.      Plaintiff's Testimony**

At the July 19, 2013 hearing before the ALJ, Plaintiff testified that he last worked as a self-employed, part-time remodeling contractor from January through May 2005. (R. 27). As part of that roofing and tiling work, he would lift 100 to 120 pounds of weight and was on his feet "pretty much all day." (R. 28). Plaintiff did not do any work in 2006 and stated that his lower back pain began on May 1, 2006. (R. 21). Since that time, he has spent most of his days at home watching TV, sitting at the computer playing poker games, and laying down (two hours per day in the afternoon). (R. 32-33, 35, 37-38). Plaintiff testified that he sat "a lot" throughout 2006 and 2007, and could do so for one hour at a time before needing to get up. (R. 22, 47). He was also able to lift between

10 and 20 pounds and walk for more than an hour. (R. 47-48). Even so, his pain was consistently at a level of 9 or 10 out of 10. (R. 24). In addition to the back pain, Plaintiff said he also experienced depression in 2006 and 2007 that caused him to get angry and nervous and start crying. A doctor prescribed him medication for a time but he has not had any further symptoms since 2007. (R. 44-45).

## C.    Medical Expert's Testimony

Dr. Kravitz testified at the hearing as the ME. He identified back pain as Plaintiff's major problem and expressed "concern[] about the rapid exacerbation over the last year or two years." (R. 52). He also indicated that Plaintiff may have become disabled in 2010. (R. 54). Based on Plaintiff's testimony and the medical record, however, the ME did not believe the back pain "was that bad in '06." (*Id.*). In that regard, the ME opined that during the relevant time period from May 2006 through March 2007, Plaintiff did not suffer from an impairment that met or equaled a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (R. 52-53). The ME observed that insufficient and conflicting evidence made it difficult to assess Plaintiff's physical limitations prior to 2008, but also found that for the period 2008 through 2010, "an appropriate RFC would be perhaps a full range of light" work, with occasional lifting of 20 pounds; frequent lifting of 10 pounds; and sitting, standing, and walking up to six hours; but no exposure to workplace hazards such as exposed, unprotected heights, excavations, and dangerous machinery. (R. 53-54, 56).

In reaching this conclusion, the ME acknowledged Dr. Abdulmassih's May 15, 2013 RFC Questionnaire but noted that the stated limitations in standing, sitting and walking were not substantiated anywhere else in the record, either before or just after

the DLI. (R. 58). The ME also questioned the significance of the unattributed September 4, 2007 examination note because he could not tell "when it was generated or by whom." (*Id.*).

## D. Psychological Expert's Testimony

Dr. Carney testified at the July 19, 2013 hearing as a PE. (R. 59). In his view, there was insufficient medical evidence in the record to suggest that Plaintiff ever had a serious psychiatric problem, or that his depression caused any functional limitations between May 2006 and March 31, 2007. (R. 61-62, 64). As the PE noted, the first time Plaintiff ever mentioned depressive symptoms was when he saw Dr. Hanna in October 2010. (R. 64, 551).

## E. Administrative Law Judge's Decision

The ALJ found that as of the March 31, 2007 date last insured, Plaintiff suffered from degenerative disc disease of the lumbar spine and knee, diabetes mellitus and hypertension, but that these severe impairments did not meet or equal any listing. (R. 142-43). After reviewing the medical record and testimonial evidence, the ALJ determined that Plaintiff had the RFC to perform the following activities through the DLI: occasionally lift, carry, push and pull up to 20 pounds; frequently lift, carry, push and pull up to 10 pounds; sit, stand and walk for up to 6 hours in an 8-hour workday; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; and never work at unprotected heights, or around excavations or dangerous moving machinery. Though Plaintiff could not understand, recall, focus upon, attend to and carry out complex or detailed instructions or tasks, he was able to

understand, recall, focus upon, attend to and carry out simple, routine tasks, meaning "those which do not change in nature on a daily basis."  (R. 143-44).

In reaching this conclusion, the ALJ noted "an absence of supportive records" prior to the March 31, 2007 DLI, and said he was persuaded by the ME's opinion that Plaintiff could perform light work up to that point.  (R. 148).  The ALJ also accepted the PE's opinion that Plaintiff did not have a disabling mental impairment before the DLI given that the first reference to depression was in 2010.  (R. 149).  As for Plaintiff's testimony, the ALJ found him "not entirely credible" given his lack of medical treatment or use of pain medications, his work history, and his activities of daily living.  (R. 144-45).

Based on these findings, the ALJ accepted the VE's testimony that Plaintiff was capable of performing his past relevant work (which the VE characterized as an electric-assembler) at all times prior to the DLI.  (R. 149).  Since it was unclear whether that job constituted substantial gainful activity, however, the ALJ alternatively found that there were other jobs in the national economy that Plaintiff was able to perform including cleaner (6,100 jobs available in Illinois), packer (18,000 jobs available in Illinois), and machine tender (18,000 jobs available in Illinois).  (R. 150).  The ALJ thus concluded that Plaintiff was not disabled within the meaning of the Social Security Act from the May 1, 2006 alleged onset date through the March 31, 2007 date last insured, and is not entitled to benefits.  (R. 151).

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act.  In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations."  *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astru*e, 478 F.3d 836, 841 (7th Cir. 2007)).  The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pepper v. Colvin*, 712 F.3d 351, 361-362 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled."  *Simila v. Astru*e, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'"  *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)).  Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhar*t, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.     Five-Step Inquiry

To recover disability benefits under the SSA, a claimant must establish that he is disabled within the meaning of the SSA.  *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016).  A person is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).  In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy."  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520).  If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five.  *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## C.     Analysis

Plaintiff argues that the ALJ's decision must be reversed or remanded because he: (1) failed to adequately develop the record as required for a pro se claimant; (2) erred in determining Plaintiff's disability onset date; (3) improperly concluded that Plaintiff had the RFC to perform light work prior to March 31, 2007; and (4) erred in assessing his statements regarding the limiting effects of his symptoms.

### 1. ALJ's Duty to Develop the Record

Plaintiff first objects that the ALJ failed to make a sufficient effort to obtain treatment records from Dr. Zureikat and Dr. Russo even though "evidence from 2006 and 2007 was crucial to the adjudication of [his] application." (Doc. 17, at 7, 8).[2] Though a claimant bears the ultimate burden of proving disability and must furnish some medical evidence to support his claim, "the ALJ in a Social Security hearing has a duty to develop a full and fair record." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). This duty is "enhanced when a claimant appears without counsel; then the ALJ must 'scrupulously and conscientiously [ ] probe into, inquire of, and explore for all the relevant facts.'" *Id.* (quoting *Thompson v. Sullivan,* 933 F.2d 581, 585-86 (7th Cir. 1991)). As the Seventh Circuit explains, an ALJ is "required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information." *Id.* (citing 20 C.F.R. §§ 416.912(d)-(f), 416.919, 416.927(c)(3)).

At the same time, "it takes 'a significant omission … before [a] court will find that the [Commissioner] failed to assist pro se claimants in developing the record fully and fairly.'" *Moore*, 851 F. Supp. 2d at 1131 (quoting *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994)). For this reason, "[t]he Seventh Circuit holds that the ALJ has not failed to adequately develop the record where the claimant does not show they were prejudiced by a lack of development." *Miller v. Colvin*, No. 11 C 50141, 2014 WL 2708387, at *11 (N.D. Ill. June 11, 2014) (citing *Martin v. Astrue*, 345 F. App'x 197, 202 (7th Cir. 2009)). "'Mere conjecture or speculation that additional evidence might have been obtained in

---
[2]     For ease of reference, unless otherwise specified, page numbers for all briefs and exhibits are drawn from the CM/ECF docket entries at the top of the filed document.

the case is insufficient to warrant a remand.'" *Moore*, 851 F. Supp. 2d at 1143 (quoting *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994)).

Here, the ALJ convened and deferred four hearings prior to holding the final one on July 19, 2013, all in an effort to give Plaintiff time to find counsel and to assist him in requesting and obtaining additional medical evidence for the relevant period between May 1, 2006 and March 31, 2007. At the first hearing on March 9, 2012, the ALJ explained that Plaintiff was entitled to be represented by counsel or other qualified person of his choice, and provided guidance on finding an attorney. He also discussed the potential costs of representation, and explained how counsel could assist Plaintiff in preparing to give testimony, updating medical records, calling additional witnesses, and making legal arguments. (R. 117-118). The ALJ further instructed the hearing monitor to provide Plaintiff with a list of attorneys in the area. (R. 129).

Turning to the medical records, the ALJ went through all the materials he had from various doctors and practitioners, and gave Plaintiff a CD containing those documents. The ALJ also explained that Plaintiff needed to prove he was disabled "on or before March 31st of 2007," but that the oldest records before him were from 2009. (R. 120). When Plaintiff said that Dr. Zureikat treated him in 2007, the ALJ acknowledged his obligation to try and complete the record and said that he would request those documents, "but you've got to tell me where to request [them] from." (R. 121-22, 125). The ALJ declined Plaintiff's offer to proceed with the hearing that day without the records because the medical expert said there was insufficient evidence to allow him to realistically determine what type of limitations were present in 2007. (R. 128-129). The ALJ instructed the hearing monitor to give Plaintiff the telephone number

for the ALJ's clerk, and asked Plaintiff to call with Dr. Zureikat's address. Finally, the ALJ provided Plaintiff with a release form that would allow the ALJ to obtain Plaintiff's records. (R. 129).

Plaintiff was still unrepresented at the second hearing on October 2, 2012, but he told the ALJ that he had spoken to an attorney who might take the case if he could get a continuance. (R. 103-04). The ALJ once again went through all of the medical records that had been submitted, acknowledging receipt of Dr. Zureikat's May 9, 2012 letter stating he had treated Plaintiff "from 2005 to 2006." (R. 106-07, 533). The ALJ also had Plaintiff confirm that there were no additional records available from Dr. Russo besides those covering the period from October 2010 through June 2011. (R. 107). Before recessing the hearing so Plaintiff could contact his attorney, the ALJ instructed him to: obtain follow-up records from Dr. Hanna; give the hearing monitor a release to obtain records from Dr. Abdulmassih; and fill out a third release to obtain records from Dr. Lazar. (R. 109-10, 112, 557, 558).

At the third hearing on January 29, 2013, Plaintiff appeared with counsel, James Comerford. The ALJ began by confirming that he had sent record requests to Dr. Lazar, Dr. Hanna and Dr. Abdulmassih, and that he had received documents from the first two treaters. (R. 92-93). Mr. Comerford represented that Dr. Zureikat "apparently destroyed [his] records" from 2005 to 2006, so the ALJ listed potential options such as sending the doctor tailored interrogatories, bringing him in to testify, and asking him to complete an RFC assessment for that period. (R. 93, 94). Since there were still no records from before 2009, the ALJ suggested that counsel attempt to contact Plaintiff's treaters for any additional information. (R. 95-99). The ALJ also requested that counsel

let him know if the ALJ should issue a subpoena to bring Dr. Zureikat to a hearing.  The ALJ then adjourned the proceedings, stressing that everyone needed to "do the best we can to get [further evidence], because it's a disservice to [Plaintiff] and also to the agency if we don't try to get what's there."  (R. 98-99).

The ALJ began the fourth hearing on May 16, 2013 by noting that Mr. Comerford had withdrawn his representation three days earlier on May 13, 2013.  (R. 78).  Plaintiff, once again pro se, told the ALJ that Mr. Comerford had sent Dr. Zureikat a form similar to the one filled out by Dr. Abdulmassih (presumably the RFC Questionnaire), which he copied to Plaintiff in an email.  (R. 79).  Plaintiff reported that Dr. Zureikat had called him to say he remembered Plaintiff but needed an extension of time to "look at" the information requested in the form.  (R. 80, 85).  The ALJ asked Plaintiff to provide Dr. Zureikat's address and phone number, as well as the email with the blank form Mr. Comerford had sent to him.  (R. 87-88).  The ALJ also stated that when the hearing was over and they were off the record, he and Plaintiff were going to call Dr. Zureikat to obtain his address.  (R. 88).  A few weeks later, on June 12, 2013, Dr. Zureikat submitted his records to the Social Security Administration.  (R. 568-609).  The ALJ then went forward with a final hearing on July 19, 2013.

In this Court's view, the above narrative demonstrates that the ALJ more than satisfied his duty to "contact[] treating physicians and medical sources to request additional records and information."  *Nelms*, 553 F.3d at 1098.  The ALJ made every effort to assist Plaintiff in developing a full and fair record, and repeatedly worked with him to obtain documents from all of his treating physicians.  The ALJ also explained the importance of records dating from 2006 and 2007, paying particular attention to Dr.

Zureikat since he was the only doctor Plaintiff identified as having treated him during that time period. As a result of the ALJ's efforts, Dr. Zureikat finally submitted his records in June 2013, albeit only for the period 1996 through 2001.

Plaintiff argues that the ALJ should have been similarly zealous in pursuing records from Dr. Russo, who provided treatment notes for October 2010 through June 2011. (Doc. 17, at 8). The problem for Plaintiff is that he never told the ALJ that Dr. Russo treated him in 2006 and 2007, and even confirmed at the October 2, 2012 hearing that Dr. Russo's records were complete. (R. 107). The first and only indication that Dr. Russo treated Plaintiff prior to the DLI was the doctor's November 26, 2013 letter to that effect. (R. 628). Of course, this arrived nearly three months *after* the ALJ's August 26, 2013 decision to deny benefits. On these facts, the ALJ cannot be faulted for not requesting additional records from Dr. Russo. "After all, '[e]ven a pro se litigant bears some responsibility for making a record.'" *Martin*, 345 F. App'x at 202 (quoting *Johnson v. Barnhart*, 449 F.3d 804, 808 (7th Cir. 2006)).

Since the ALJ satisfied his heightened duty to develop the record, Plaintiff must show that he was prejudiced by the absence of medical records dating from May 1, 2006 through March 31, 2007. *Martin*, 345 F. App'x at 202. This requires that he set forth specific, relevant facts that the ALJ did not consider. *Nelms*, 553 F.3d at 1098. In *Nelms*, for example, the plaintiff produced a "separate appendix of medical records from 2003, 2004, and 2005 for the limited purpose of demonstrating prejudice." *Id*. Those records contained examination reports and diagnoses that likely would have led the ALJ to find the plaintiff disabled had he considered them. *Id*.

Plaintiff has not produced any additional records to support his disability claim despite being represented by experienced counsel on appeal. With respect to Dr. Zureikat, Plaintiff claims that the records were "purged," and the ALJ therefore should have issued a subpoena or otherwise "summoned Dr. Zureikat to testify or . . . sent interrogatories." (Doc. 17, at 8; Doc. 26, at 3). As a preliminary matter, neither Dr. Zureikat's cover letter to the SSA attaching his treatment notes, nor his May 9, 2012 letter in which he claimed to have treated Plaintiff from 2005 to 2006, said anything about documents being destroyed. (R. 533, 568). Indeed, it seems unlikely that a doctor would retain records from 1996 while destroying more recent ones from 2005 and 2006.

In any event, "[a] claimant is not automatically entitled to a subpoena as a matter of course," but only "when it is reasonably necessary for the full presentation of a case." *Williams v. Colvin*, No. 14 C 5075, 2015 WL 5227736, at *3 (N.D. Ill. Sept. 4, 2015) (quoting 20 C.F.R. § 404.950(d)(1)). Plaintiff fails to articulate what specific testimony or facts Dr. Zureikat might provide that would support his claim of disability. The May 2012 letter offers nothing more than a conclusory statement that Plaintiff received physical therapy and injections "for inflammation and pain" in 2005 and 2006, (R. 533), and there is no evidence to suggest that Dr. Zureikat has any further information regarding Plaintiff's specific functional limitations or ability to perform work activities in 2006 and 2007. Under such circumstances, Plaintiff has not demonstrated that he suffered prejudice because the ALJ failed to have Dr. Zureikat testify at the July 2013 hearing.[3] *See Martin*, 345 F. App'x at 202 (finding no prejudice warranting remand

---

[3] As noted, Dr. Zureikat's records may have been destroyed, so it is unclear how he would recall details of Plaintiff's condition in 2005 and 2006 if called to testify at a hearing more than 7

where the plaintiff "did not identify or provide additional records before the Appeals Council or the district court, and even now he has not attempted to detail what additional information about his condition the ALJ would have uncovered.").

Plaintiff's request to subpoena Dr. Russo is similarly flawed. Dr. Russo's November 26, 2013 letter stated that he treated Plaintiff from September 2, 2006 "throughout 2007 and proceeding years," but the records he submitted covered only October 2010 through June 2011. (R. 498, 507-23, 628).[4] Plaintiff has not produced any additional treatment notes from Dr. Russo, which "begs the question whether there are any." *Moore*, 851 F. Supp. 2d at 1144. Also missing is an affidavit or other evidence indicating that Dr. Russo would support Plaintiff's claim of disability if called upon to testify or answer interrogatories. Thus, Plaintiff has not satisfied his burden of showing that he was prejudiced by the ALJ's failure to issue a subpoena to Dr. Russo. *See Nelms*, 553 F.3d at 1098 (requiring that a plaintiff set forth "specific, relevant facts . . . that the ALJ did not consider.").

On the record presented, the Court is satisfied that the ALJ adequately fulfilled his duty to develop a full and fair record, and Plaintiff has not demonstrated that he was prejudiced by the lack of additional evidence or testimony from Dr. Zureikat and Dr. Russo. Plaintiff's request for remand on this basis is denied.

---

years later in 2013. That may explain why Plaintiff has not supported this appeal with the completed RFC Questionnaire that his former counsel purportedly sent to Dr. Zureikat in January 2013.

[4] There is a treatment record that may be from Dr. Russo dated September 4, 2007, (R. 624), but it states that Plaintiff was there for an "initial examination" that day. In other words, the note at best contradicts Dr. Russo's claim that he started treating Plaintiff on September 2, 2006. (R. 628).

### 2. Determination of Onset Date

Plaintiff argues that the case must still be remanded because the ALJ "did not follow the dictates of SSR 83-20" in determining the onset date of his disability. (Doc. 17, at 10). SSR 83-20 "addresses the situation in which an [ALJ] makes a finding that an individual is disabled as of an application date and the question arises as to whether the disability arose at an earlier time." *Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004). Plaintiff fails to indicate where in the decision the ALJ found him disabled. The ALJ did note the ME's observation that "there may be a meeting or equaling of various of the 1.00 listings as of 2010," (R. 148), but the ALJ in no way adopted that opinion or gave any indication that he believed Plaintiff was disabled as of the March 24, 2010 application date. "Because the ALJ did not find that Plaintiff was disabled, 'there was no need to find an onset date,'" and SSR 83-20 does not apply. *Cirelli v. Astrue*, 751 F. Supp. 2d 991, 1002 n. 4 (N.D. Ill. 2010) (quoting *Scheck*, 357 F.3d at 701).

### 3. RFC Determination

Plaintiff next objects that the ALJ's RFC determination is not supported by substantial evidence. A claimant's RFC is the maximum work he can perform despite his limitations, and is a legal decision rather than a medical one. 20 C.F.R. §§ 404.1520(e), 404.1527(d)(2), 404.1545; SSR 96-8p, 1996 WL 374184, at *2. "When determining the RFC, the ALJ must consider all medically determinable impairments, . . . even those that are not considered 'severe.'" *Craft*, 539 F.3d at 676.

The ALJ concluded that from May 1, 2006 through the March 31, 2007 DLI, Plaintiff had the capacity to perform light work involving lifting or carrying up to 20 pounds occasionally and 10 pounds frequently; pushing or pulling up to 20 pounds

occasionally and 10 pounds frequently; and sitting, standing, and walking, with normal breaks, for up to 6 hours in an 8-hour workday. Though Plaintiff could not climb ladders, ropes, or scaffolds, he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He also needed to avoid exposure to workplace hazards, such as exposed or unprotected heights and excavations, or unprotected dangerous moving machinery. Finally, Plaintiff could understand, recall, focus upon, and carry out simple routine instructions, and focus upon and perform simple routine tasks. (R. 140, 143-44).

Plaintiff argues that the ALJ essentially created this RFC out of whole cloth with no evidentiary support. His theory is as follows. The ALJ rejected Dr. Abdulmassih's May 15, 2013 RFC Questionnaire stating that Plaintiff has experienced severe functional limitations from back pain with sciatical radiculopathy since early 2002. As the ME noted, there are no underlying treatment notes to substantiate Dr. Abdulmassih's extreme findings, and it appears that he did not even start seeing Plaintiff until 2012, some 10 years after the alleged diagnosis date. (R. 147). The ALJ also declined to rely on Plaintiff's subjective testimony regarding his limitations, finding that he was not entirely credible. (R. 144).

That left the opinions from the ME and the PE, both of whom stated that there was insufficient evidence in the record to assess Plaintiff's degree of physical and mental limitations prior to March 31, 2007. In Plaintiff's view, "[o]nce the ALJ was without medical opinion evidence or subjective testimonial evidence to guide his assessment of [Plaintiff's] RFC," he had only an "evidentiary deficit" that he could not fill with his own lay medical knowledge. (Doc. 17, at 12; Doc. 26, at 4-5) (citing *Suide v.*

*Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010)) (where the ALJ's rejection of medical opinions left an "evidentiary deficit," it was "unclear . . . how the ALJ concluded that [the plaintiff] could stand and/or walk for six hours a day.").  The Court disagrees.

The ALJ acknowledged that there was a dearth of evidence regarding Plaintiff's medical condition in 2006 and 2007.  That is why he worked so diligently to obtain additional records, as discussed earlier.  Nevertheless, the ALJ also noted the ME's testimony that as of 2008, Plaintiff was still capable of performing a full range of light work.  (R. 148).  It was entirely reasonable for the ALJ to conclude, in the absence of medical records to the contrary, that Plaintiff had at least the same functional capacity before 2008 as well.  In that regard, Plaintiff testified that his condition has only gotten worse over time, not better, and as late as May 2005 he was still doing construction work requiring that he lift 100 pounds or more at a time and stand for "a good portion of the day." (R. 145).  Even the unattributed note from September 4, 2007, more than five months after the DLI, states only that Plaintiff cannot perform "strenuous" work, as opposed to all work, and recommends just 15 sessions of physical therapy.  (R. 625).  As for Plaintiff's mental condition, the PE testified that there was no reference to depression in the medical records until 2010, and no evidence that Plaintiff had any mental limitations at all prior to that date. (R. 149).

Though this evidence supports a finding that throughout 2006 and 2007 Plaintiff was capable of a full range of light work with no other restrictions (aside from avoiding hazardous environments), the ALJ gave Plaintiff the benefit of the doubt and imposed further limitations consistent with his testimony.  To address Plaintiff's claim that his pain caused difficulty with concentration, persistence and pace, the ALJ limited him to

simple, routine instructions and tasks which do not change in nature on a daily basis. (R. 142, 144). The ALJ also found that Plaintiff could not climb ladders, ropes or scaffolds, and could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. 143). Finally, the ALJ restricted Plaintiff to occasionally pushing and pulling 20 pounds and frequently pushing and pulling 10 pounds. (*Id.*).

Plaintiff does not point to any medical evidence suggesting that he had greater functional limitations before the March 31, 2007 DLI. The cases he cites in support of a remand involve situations where an ALJ found a claimant *less* restricted than physicians of record, whereas here the ALJ found Plaintiff *more* restricted. *See, e.g., Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352-53 (7th Cir. 2005) (ALJ erred in finding plaintiff disabled as of January 1994 but capable of light work prior to that time without record support for that conclusion). Viewing the record as a whole, the ALJ's RFC determination is supported by substantial evidence and Plaintiff's request for remand on this basis is denied.

### 4. "Credibility" Determination

Plaintiff finally argues that the ALJ erred in finding his testimony "not entirely credible." (Doc. 17, at 14; R. 144). The regulations describe a two-step process for evaluating a claimant's own description of his impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2.[5] If there is such an impairment, the ALJ must

---

[5] The Social Security Administration recently updated its guidance for evaluating symptoms in disability cases. SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016, 2016 WL 1237954). The new ruling supersedes SSR 96-7p and eliminates the term "credibility" to "clarify that subjective symptom evaluation is not an examination of the individual's character."

"evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, h[is] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, . . . and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). An ALJ's assessment of a claimant's subjective complaints will be reversed only if "patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

As a preliminary matter, Plaintiff objects to the ALJ's use of language the Seventh Circuit has criticized as "meaningless boilerplate." (Doc. 17, at 14) (citing *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)). "But the use of boilerplate is not a ground to remand if the ALJ justified his credibility assessment based on the evidence." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016). *See also Jackson v.* Colvin, No. 12 C 1324, 2013 WL 1499010, at *5 (N.D. Ill. April 11, 2013) (citing *Richison v. Astrue*, 462 F. App'x 622, 625 (7th Cir. 2012) (noting boilerplate language is "inadequate, by itself, to support a credibility finding," but affirming decision where "the ALJ said more.")).

Here, the ALJ did just that, noting for example that despite Plaintiff's complaints of knee and back pain prior to the DLI, he testified that he "worked as a self-employed remodeling contractor, where he had to lift upwards of 100 pounds and was required to stand for a good portion of the day, as late as May 2005." (R. 145). There are no

<hr>

*Id.* at *1. Since the regulation merely clarifies rather than changes existing law, it is appropriate to evaluate Plaintiff's credibility argument in light of the new guidance. *Lockwood v. Colvin*, No. 15 C 192, 2016 WL 2622325, at *3 n.1 (N.D. Ill. May 9, 2016). *See also Estes v. Colvin*, No. 14 C 3377, 2016 WL 1446218, at *6 (N.D. Ill. Apr. 11, 2016).

treatment notes of any kind from 2002 through 2006, and the single unattributed note from September 2007 (five months after the DLI) indicated that Plaintiff was only precluded from performing "strenuous" work activity. (R. 567). The ALJ reasonably concluded that this evidence weighed against Plaintiff's claims of disabling symptoms. *Cf. Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (ALJ erred in finding the plaintiff capable of lifting up to 40 pounds based on a medical assessment that was completed before she suffered the back injury she said caused her to become disabled).

The ALJ also considered Plaintiff's medications, acknowledging his assertion that Dr. Hanna prescribed him hydrocodone for back pain in 2004. (R. 145, 443). Of course, the record shows that Dr. Hanna did not even start treating Plaintiff until October 2009, and Plaintiff said nothing about back or knee pain during that first visit. (R. 465). As for other pain medications, the ALJ correctly observed that they were all prescribed in 2010 and later. (R. 145, 429, 434, 443). In addition, though Plaintiff complained of symptoms such as drowsiness and memory problems as a result of a variety of medications prescribed by Dr. Hanna, this once again had to be in 2010 or later, "which is well after the . . . date last insured." (R. 145, 408).

Plaintiff argues that the ALJ should have asked him "why he did not take additional pain medication during the period from May 2006 through March 2007." (Doc. 26, at 7) (citing *Craft*, 539 F.3d at 679) (an ALJ "'must not draw any inferences' about a claimant's condition from []his failure [to seek medical treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care."). To be sure, an individual might not take prescription medications because the side effects are less

tolerable than the symptoms, or because he cannot afford medical care. SSR 16-3p, 2016 WL 1119029, at *9. Yet Plaintiff does not claim that his lack of treatment from 2006 through March 31, 2007 had anything to do with these or any other reasons set forth in the regulation. In fact, he claims he *did* receive treatment during that period and his doctors simply cannot find his records.

Plaintiff finally contends that the ALJ erred by equating his ability to do activities of daily living with an ability to sustain full-time work. (Doc. 17, at 15) (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)). This is not accurate. The ALJ fairly considered Plaintiff's activities of daily living as one factor in assessing his symptoms, and determined that his stated ability to sit for one hour, walk for more than one hour, and lift approximately 20 pounds before March 31, 2007 was inconsistent with his claim of total disability. (R. 144-45). There was nothing improper about this aspect of the ALJ's analysis. *See Hackel v. Colvin*, No. 14 C 1429, 2016 WL 707020, at *15 (E.D. Wis. Feb. 22, 2016) ("[I]t is proper for the ALJ to consider a claimant's activities of daily living in assessing [the limiting effects of her symptoms] because inconsistencies between activities of daily living and the claimant's self-reported limitations may suggest that a claimant's testimony regarding her symptoms are exaggerated.").

In sum, the ALJ built a logical bridge between the evidence and his conclusion that Plaintiff's statements regarding the severity of his symptoms did not support his claim of disability from May 1, 2006 through March 31, 2007.

### 5.    Evidentiary Standard

Plaintiff makes one additional argument that is difficult to categorize but easily dismissed. Specifically, he claims that the ALJ held him to an incorrect evidentiary

standard based on the following question posed to the ME at the July 19, 2013 hearing: "In other words, we can't really with any reasonable degree of medical certainty . . . even identify what might be" Plaintiff's functional limitations prior 2010? (R. 54). Plaintiff believes this demonstrates that the ALJ required him to establish disability to a "reasonable degree of medical certainty," when the regulations contemplate a much lower "preponderance of the evidence" standard. (Doc. 17, at 9) (citing 20 C.F.R. § 404.953(a)). This argument lacks merit because Plaintiff fails to identify any language in the decision suggesting that the ALJ actually applied a "reasonable degree of medical certainty" standard, or somehow held Plaintiff to a heightened or improper burden of proof. The ALJ's isolated remark at the hearing is insufficient to establish that he used the wrong evidentiary standard and does not justify remanding the case.

## CONCLUSION

For the reasons stated, Plaintiff's motion to reverse the ALJ's decision is denied, and Defendant's Motion for Summary Judgment [Doc 24] is granted. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated:    May 27, 2016

_____
SHEILA FINNEGAN
United States Magistrate Judge